642 So.2d 216 (1994)
Charlotte S. NIGREVILLE, etc., Plaintiff-Appellant,
v.
FEDERATED RURAL ELECTRIC INSURANCE, CO., et al., Defendants-Appellees.
No. 93-1202.
Court of Appeal of Louisiana, Third Circuit.
July 13, 1994.
Rehearing Denied October 11, 1994.
*217 William Preston Crews Jr., Natchitoches, for Charlotte A.S. Nigreville etc.
Brian David Smith, Shreveport, for Federated Rural Elec. Ins. Co., et al.
H.O. Lestage, III, De Ridder, for American Interstate Ins. Co. of Georgia.
Before YELVERTON, THIBODEAUX, SAUNDERS, DECUIR and CULPEPPER[*], JJ.
THIBODEAUX, Judge.
Charlotte Sepulvado Nigreville brought suit for herself and on behalf of her minor children, Latasha Danette Nigreville and Robert Anthony Nigreville, Jr., for the wrongful death of Robert Anthony Nigreville, against defendants, Valley Electric Membership Corporation (VEMCO) and its insurer, Federated Rural Electric Insurance Company.
The jury awarded $250,000.00 to each child and $250,000.00 in economic loss to Mrs. Nigreville, individually and on behalf of her children. Charlotte Nigreville received nothing for her wrongful death claim. VEMCO was assessed fifteen percent fault and decedent was assessed eighty-five percent fault. The decedent's employer's fault was neither considered nor quantified.
Motions for judgment notwithstanding the verdict were filed by both sides. After argument, the trial court changed the allocation of fault to fifty percent for both VEMCO and decedent. All other aspects of the jury's verdict were unchanged. Both sides appeal.
*218 For the following reasons, we reverse the judgment insofar as it concerns the allocation of fault and the lack of a wrongful death award to Charlotte Nigreville; we reapportion fault after considering decedent's employer's fault; we render an award to Charlotte Nigreville for the wrongful death of her husband; and, we affirm that portion of the judgment pertaining to the general damage and loss of support awards to the two minor children.

ISSUES
VEMCO raises the following issues:
(1) Whether the trial court abused its discretion by granting JNOV on the issue of fault and reallocating fault at fifty percent to each party;
(2) whether employer fault should have been considered by the jury;
(3) whether the jury should have been allowed to consider the employer's OSHA violations;
(4) whether the general damage awards to the minor children and the economic loss award were an abuse of discretion; and,
(5) whether the jury was inflamed and prejudiced by photographs of decedent's corpse.
Plaintiffs appealed and answered defendants' appeal and raised the following issue:
(1) Whether Charlotte Nigreville should have recovered for the wrongful death of her husband.

FACTS
On September 6, 1991, Robert Anthony Nigreville was electrocuted when the binding chain he was attempting to throw over logs stacked on a logging truck contacted an overhead primary electrical power line carrying a charge of 7,620 volts. The line is owned and maintained by VEMCO.
Decedent had been employed by Harold Stewart as a mechanic and truck driver for nearly ten years prior to his death. On the day of his death, he was driving a logging truck owned by Stewart and under contract with David Meshell to remove cut timber and pulpwood from a logging site in Natchitoches Parish.
On the morning of the accident, decedent followed Meshell to the loading site. The site was only accessible by an unpaved rural road known locally as Austin Megason Road. When Meshell turned off of Parish Road 450 and onto Austin Megason Road, he noticed the power lines appeared to be hanging low. Meshell testified he contacted decedent by citizens band radio to warn him of the low hanging lines.
Decedent's truck was loaded the first time at approximately 8:00 a.m. Because the loading site was muddy from recent rain, it was necessary to have a "skidder" tow the logging truck to a point on Austin Megason Road where the truck could get traction. The area to which the trucks were towed was near a "catch pen," or corral.
State law requires that logs on a truck be bound by at least two chains. This is accomplished most often by the driver throwing the chain over the stack of logs and binding it with equipment designed for that purpose. State law also requires that the load be bound before the truck enters a public highway. Decedent managed to bind the first load without incident and deliver his load to a mill in Florien.
After decedent returned and his truck was reloaded, it was again necessary that it be towed to the area near the catch pen. The catch pen was serviced by an electrical meter. The service wire ran from a nearby pole with a transformer on top of it. From the transformer pole, the power lines run parallel with Austin Megason Road. Austin Megason Road runs north-south. The power lines were located on the eastern edge of the road. Decedent drove along Austin Megason road until a point approximately 180 feet from its intersection with the parish road where he attempted to bind the logs.
The power lines consist of two wires, a primary and a neutral. The police report of the accident reflected the height of the neutral wires as thirteen feet, eleven inches and the height of the primary line as seventeen feet, eight inches. There were no witnesses to the accident, but a summation of opinions of witnesses who investigated the scene is that decedent was standing behind the rear *219 wheels of the truck, near the front left side of the trailer and was attempting to throw the chain over the logs on that end when the chain struck the line. He was killed instantly and fell on his back under the truck. The official cause of death as indicated by the coroner's report was electrocution.

LAW & ANALYSIS

I. Fault
The first three issues raised by defendants concern fault. Defendants first contend the trial court erred in granting JNOV and increasing their fault. We need not address the propriety of the JNOV as the second issue, concerning the trial court's exclusion of evidence or assessment of employer fault, demonstrates a clear error that requires us to conduct a de novo review of the record and reapportion fault entirely.
The 1987 amendment to La.Civ.Code art. 2324 mandates assessment of the fault of a statutorily immune employer to achieve an appropriate assessment of fault between plaintiffs and third party tortfeasors. Gauthier v. O'Brien, 618 So.2d 825 (La.1993). This court was the first to entertain Gauthier, and we concluded employer fault was excluded from assessment.[1] The trial judge relied on our Gauthier opinion in excluding all evidence of employer fault and defendant's proposed jury charges and interrogatories which referred to employer fault. The Louisiana Supreme Court's reversal of Gauthier, supra, demands that we now quantify employer fault.
The effect of the error preempts the allocation of fault by both the jury and the trial judge on JNOV. In Graves v. Lou Ana Foods, Inc., 604 So.2d 150 (La.App. 3d Cir. 1992), the trial court erroneously charged the jury to consider and assess employer fault for an accident that occurred before the 1987 amendment to art. 2324. We reversed and, because the record was complete and under authority of Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975), undertook a de novo review of the issues presented. In this instance, neither the jury nor the trial judge considered employer fault in assessing percentages among the parties when the law mandated its consideration. This clear error warrants reversal. Because defendants proffered its evidence pertaining to employer fault, the record is complete and we may conduct a de novo review and assess fault among the parties without regard to prior allocations by the jury or trial judge.
Before we undertake the assessment, we note that the issue of the exclusion of evidence of the employer's OSHA violations, is rendered irrelevant. The evidence of OSHA violations was offered primarily to demonstrate employer negligence, which goes directly to fault, and was introduced into the record as an offer of proof. Because our review is de novo, we will review all of the evidence in the record and give it the weight it deserves as it pertains to fault.
The court in Weaver v. Valley Electric Membership Corporation, 615 So.2d 1375, 1382 (La.App. 2d Cir.1993), citing Levi v. S.W. La. Elec. Membership Co-op., 542 So.2d 1081 (La.1989), Dobson v. Louisiana Power & Light Company, 567 So.2d 569 (La. 1990), Hebert v. Gulf States Utilities, Co., 426 So.2d 111 (La.1983) and Simon v. Southwest Louisiana Electric Membership Corp., 390 So.2d 1265 (La.1980), aptly summarized a power company's duty with respect to its overhead transmission lines:
"... If a reasonable person, exercising his or her perception, attention, memory, knowledge and experience, would or should reasonably recognize that overhead transmission lines pose to him or her a risk of harm [that is unreasonable], a power company, practicing electrical safety and thereby possessing equal or superior qualities, is legally required to recognize that particular risk of harm. This duty exists on the part of a knowledgeable power company in some circumstances even though the height of the overhead transmission line exceeds industry safety distance or height standards, as in Levi. The standard to which the power company is held in such circumstances becomes that of a reasonable person with superior attributes. Levi, supra, 542 So.2d at 1084.

*220 Mere compliance with safety standards does not, per se, relieve the utility of negligence. Simon, supra; Levi, supra. When the insulation, height, distance and other safety attributes of transmission lines are considered in the light of developmental factors (population and building density and use of land and structures), even though these factors are not attributable, but are, or should be known, to the utility, the utility can no longer fulfill its duty by maintaining the status quo of protective measures which may have been deemed before development to be legally sufficient to avoid accidents at the work place. The utility's duty is to take reasonable measures to assure that workers legitimately in the area are able to work without an unreasonable risk of harm from high voltage transmission lines. Hebert, supra, at 116 (who had actual knowledge of risk); and Levi, supra, at 1085-86 (who had constructive knowledge of risk)."
VEMCO is responsible for maintaining the safety of its power lines. The National Electrical Safety Code sets regulations for, among other things, proper height of power lines. The Code requires energized lines such as the one involved in the accident to have a minimum height of twenty feet. Defendants' expert testified that at the time the line was installed, the minimum height was eighteen feet and a two foot sag was permitted for extreme weather conditions. However, he conceded that the proper height for the line at the time of the accident was twenty feet. The line measured seventeen feet, eight inches at the front part of the trailer. Even allowing for a two foot sag during extreme weather conditions, the height of the line was four inches below the requisite standard.
VEMCO conducts ongoing inspections of the its lines. The engineering department is required to inspect 10,000 poles and 700 miles of line per year. There are 6,500 miles of line in VEMCO's seven parish system. A full inspection of its system takes approximately eight and one half years, which is within the Code requirements. The line on Austin Megason Road was last inspected in 1986. The inspection report noted that foliage needed to be trimmed from the line, but no mention was made of line height. VEMCO has no evidence to show that the trimming was ever done. In fact, photographs of the lines taken on the day of the accident show them to be partially concealed by foliage.
Evidence was introduced that all meter readers utilized by VEMCO are instructed to report any obvious problems with the system. The meter at the catch pen was in operation prior to the accident and testimony established that it should have been checked once a month by a meter reader. VEMCO was never informed by any meter reader assigned to Austin Megason Road about safety problems with the line.
It is apparent that VEMCO breached a duty to maintain its power line on Austin Megason Road at an acceptably safe height and to keep it free of overgrowth. It is also apparent that VEMCO was aware of the foliage problem, at the least, and took no steps to correct it. Finally, the evidence shows that there was ample opportunities for its meter readers to report the safety problems, yet no such report was made. Accordingly, we hold VEMCO thirty five percent at fault for the death of Robert Nigreville.
We now consider employer fault. The evidence established that decedent was not instructed by either Meshell or Stewart on the OSHA regulations regarding safe operation of a logging truck in close proximity to power lines. No equipment was provided to insure decedent's safety should he have to operate near a power line. Although Meshell warned decedent of the low hanging lines on the morning of the accident, he stated that he did not contact VEMCO about the lines as he had often done in the past. Moreover, there was no area provided where the truck drivers could bind their loads without exposing themselves to the threat of power lines or violating state law. Accordingly, we assess employer fault at forty percent.
Finally, we address the fault of Robert Nigreville. After being warned on the morning of the accident to be aware of low power lines, decedent imprudently chose to attempt to bind his load of logs almost directly *221 beneath a span of low hanging lines. That the lines were partially concealed by foliage mitigates his imprudence. It was established at trial that he could not see the power line from where he stood when he launched the chain. Furthermore, the areas in which he could legally bind his load were even more limited by the threat of the power lines. We conclude that decedent was twenty five percent responsible for his own demise.

II. Quantum
Defendants claim that the general damage and loss of economic support awards to the children were excessive and constituted an abuse of discretion. The Louisiana Supreme Court has recently described the discretion of the trier of fact in awarding general damages as "`great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). Defendants argue the amounts awarded were excessively disproportional to those in other wrongful death cases. Youn, however, requires that we review the awards with respect to "... what a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff[s] under the particular circumstances..." of this case. Youn, Id. at 1261.
There is overwhelming evidence that the children had a close relationship with their father. The record reveals he spent much of his free time with them. It is evident from the testimony they were deeply affected by his death. While there was much debate over whether Robert, Jr.'s poor academic performance was due to his father's death, there was no debate that he devolved from a quiet, obedient child prior to the accident, to one who is troubled and whose troubles are manifesting themselves in poor conduct.
Moreover, there is clear evidence that Latasha Nigreville was extremely close to her father and has despondent and depressed as a result of his loss. It is difficult for anyone to determine the long term detrimental effects of such a tragic accident. The jury had only evidence of past pleasantry and present troubles upon which to base suitable relief. We cannot say that the award of $250,000.00 to each child was clearly abusive in light of the evidence before us.
Defendants contend that the award of $250,000.00 for the loss of economic support was also abusively high. They contend that, because Robert and Charlotte Nigreville were separated at the time of his death, the figure used to calculate support for the minor children is that which he was paying at the time of his death, which was $75.00 per week. The figure that defendants offer as correct for loss of support is $39,000.00.
Plaintiffs' expert economist, Dr. Randy Rice, determined a somewhat higher figure. Decedent was 34 at the time of his death. Dr. Rice assumed a remaining work life of 24.2 years. He then used decedent's income provided in his 1990 income tax report, applied a wage increase percentage of 3½%, which took into account both wage increases and inflationan investment rate of 6¾% and concluded that decedent's past and future earnings equaled $255,128.00. He then reduced that figure by a statistically determined percentage of decedent's personal consumption and concluded that loss of support to the surviving family was $193,264.00. He stated that this figure did not represent the surviving family's increase in spending due to the loss of decedent.
Mackie v. LaLonde, 598 So.2d 521, 523 (La.App. 1st Cir.1992), sets out succinctly the factors considered for loss of support:
Factors which should be weighed in determining the amount due for loss of support include the decedent's present earnings, age and life expectancy, worklife expectancy, the possibility of a decrease or increase in earnings, the decedent's job security, the nature of decedent's work, health, relationship with his family, personal expenses and past work record. Other factors are the surviving spouse's age and health, the minor children's age, and the effects of inflation and the need to discount future earnings to a present day amount. In short, all factors relevant to a determination of the amount of the loss of support due to the premature demise of the decedent should be considered. Blanchard v. Rodrigus, 340 So.2d 1001, 1005 (La.App. *222 1st Cir.1976), cert. denied, 341 So.2d 1129, 1130 (La.1977).
However, damages for loss of support cannot be determined with mathematical certainty. Jeffries v. Estate of Pruitt, 598 So.2d 379 (La.App. 1st Cir.1992).
Defendants' argument that the jury's award was abusively high was based less on the factors considered by the economic expert and more on the fact that Robert and Charlotte Nigreville were separated at the time of his death. They contend the jury's award is erroneous because the evidence did not prove that decedent would have supported the full family unit in his remaining working years.
The effect of the separation will be discussed more fully when we address Charlotte Nigreville's wrongful death claim. For purposes of this issue, however, suffice it to say the jury believed that Robert Nigreville would provide full support for his family over his remaining work life expectancy. This decision is supported by the evidence. Although the jury deviated somewhat from the more definitive figures given by the economist, we do not believe the deviation is significant, much less abusive. Consequently, the award for economic loss will remain undisturbed.

III. Evidence
Defendants claim the plaintiffs' photographs of decedent's body at the accident site inflamed the jury and prejudiced their case. Relevant evidence may be excluded if its probative value is outweighed by its prejudicial effect. La.Code Evid. art. 403. The trial judge is afforded great discretion in weighing the probative value of evidence. Hebert v. Angelle, 600 So.2d 832 (La.App. 3d Cir.), writ denied, 604 So.2d 997 (La.1992). The potential prejudicial effect of photographs is subject to the same consideration. Horton v. McCrary, 620 So.2d 918 (La.App. 3d Cir.1993).
The photographs to which defendants objected are not so gruesome or offensive as to rise to the level of "inflaming" the jury. Moreover, they are probative of decedent's position when he threw the chain, the results of the force of the electrical shock and the allegations that decedent was killed instantly. The trial judge was best suited to size up the jury and anticipate what evidence it could view and still maintain its unbiased position. We believe the jury was not prejudiced by the photographs and the trial court's decision did not constitute an abuse of discretion.

IV. Charlotte Nigreville's Wrongful Death Claim
The jury made no award to Charlotte Nigreville for the death of her husband. The trial court denied the request for JNOV on that issue. Our complete review of the objective evidence in the record convinces us this finding of the jury was clear error.
We are well aware of the apparent constraints on our power to review findings of fact set out in Rosell v. ESCO, 549 So.2d 840 (La.1989), and most recently in Stobart v. State, through DOTD, 617 So.2d 880 (La. 1993). However, two things convince us to choose the precarious path of reversal by manifest error. The first is that a full award for economic support but not wrongful death award for Charlotte Nigreville is impossibly polarized. The second is that the uncontradicted testimony during the trial is the couple maintained a close relationship even during their period of separation. In fact, Charlotte Nigreville was to move back into the home of decedent on the very day he was killed.
Charlotte and Robert Nigreville were married in 1981. She moved out of the family home in July of 1990 because of marital discord. In February of 1991, she filed for divorce but claimed it was mainly for the purpose of obtaining an order of child support. The couple maintained separate homes until the time of his death. However, several witnesses testified the couple saw each other almost daily, that she would go to his house with the children and prepare supper for him on an almost daily basis, that they shopped for the children's Christmas gifts together, and he would do mechanic and maintenance work for her. Various other examples of time they spent together though living apart were cited. Neither spouse dated others *223 during the period of separation. The divorce was never finalized.
The testimony also established that Charlotte Nigreville had planned to move back into her husband's home the day of his death. More than one witness corroborated this fact. Defendants seek to extract a portion of Charlotte Nigreville's testimony where she stated the couple did not "set a date" for her to move back in, but the statement is taken out of context. Her testimony as a whole reveals that although she, quite naturally, had some unresolved questions about her relationship with her husband, she had made a decision to move back in and would have done so had he not met an untimely death.
The jury obviously believed the family unit would be made whole as they awarded the full amount of loss of economic support. Thus, the only logical explanation for the verdict is that the jury believed that because the couple had not been together at the time of decedent's death, it could not compensate her for his loss. In any event, the jury erred in its decision.
This court is not blind to the difficulties couples face in marriage, and separations and divorces are commonplace in our society. However, a couple's decision to physically separate does not necessarily signify a lack of love nor, as in this instance, does it equate to absence of grief and pain if a spouse is lost. The record is replete with examples of the love Robert and Charlotte Nigreville shared after their separation. It would be untenable to refuse to compensate Charlotte Nigreville for a loss sustained as she was taking steps to reconcile. In fact, an argument can be advanced that her loss is even greater as she was deprived of the opportunity to redevelop and nurture their family unit, as she had anticipated.
Wrongful death damages to surviving spouses have been awarded even though the spouse was separated from decedent at the time of the accident. In Miley v. Louisiana Farm Bureau Casualty Insurance Company, 599 So.2d 791 (La.App. 1st Cir.1992), the jury failed to award the husband for the wrongful death of his wife from whom he was separated at the time of her death. The couple was separated for approximately four months before her death, during which time the wife dated another man but still maintained contact with her husband. The trial judge granted JNOV and awarded the husband $5,000.00. The appellate court affirmed the JNOV but raised the award to $25,000.00.
In Nguyen v. Pausina, 607 So.2d 675 (La. App. 4th Cir.1992), the court upheld a wrongful death award of $23,512.80 to the wife of decedent, an immigrant from Vietnam, even though decedent left his wife in Vietnam in 1975 and had no contact with her up to the time of his death in 1987.
Finally, in Brown v. State, through DOTD, 572 So.2d 1058 (La.App. 5th Cir.1990), the spouses were separated at the time of his death. The wife testified she and decedent had been undergoing successful counseling and had plans to reunite the night of the accident. Defendants produced a witness who testified that she and decedent were romantically involved and had plans to marry. The court upheld a jury award of $175,000.00 to the wife.
In the present case, the evidence is uncontroverted that Robert and Charlotte Nigreville cared deeply for each other. It is apparent that they remained faithful to each other even throughout the period of separation. Consequently, we believe Charlotte Nigreville has suffered a great loss because of the death of her husband. We find $250,000.00 is a justifiable award under the circumstances.

V. Impact of Employer Fault
Gauthier v. O'Brien, supra, mandates the assessment of employer fault. After its quantification, the court must reallocate the proportionate fault of the blameworthy parties once the percentage of fault assessed to the employer is disregarded. In some circumstances such as that which exists in this case, the tortfeasor's percentage of culpability may exceed his actual assessment under the concept of relative fault. When Meshell's fault of forty percent is cast aside, the remaining and proportionate fault percentages are calculated in this manner: VEMCO, 35/60th, or 58.33 percent; Robert Nigreville, 25/60th, or 41.67 percent. The practical result *224 is that VEMCO owes 58.33 percent of the recoverable damages of $1,000,000.00, the total aggregate amount of the awards, or $583,300.00. See, e.g., Crane v. Exxon Corp., U.S.A., 633 So.2d 636 (La.App. 1st Cir.1993).

CONCLUSION
For the foregoing reasons, we reverse the judgment pertaining to the assessment of fault and render judgment allocating fault in the following percentages: Valley Electric Membership Corporationthirty five percent; David Meshell, the statutory employer, forty percent; and, Robert Nigreville, the decedent, twenty five percent.
We likewise reverse the denial of Charlotte Nigreville's wrongful death claim and render judgment in the amount of $250,000.00, plus interest from the date of judicial demand.
Finally, we affirm the wrongful death awards to the two minor children of $250,000.00 each and the loss of economic support award to Charlotte Nigreville, individually and on behalf of her minor children, of $250,000.00.
The foregoing awards are reduced by 41.67 percent which is the proportionate fault attributable to Robert Nigreville.
Defendants are charged with the costs of this appeal.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
CULPEPPER, J. dissents in part and assigns reasons.
YELVERTON, J. dissents in part for the reasons assigned by CULPEPPER, J.
CULPEPPER, Judge, dissenting in part.
I dissent first from the majority's apportionment of fault. I agree that VEMCO was at fault for its line being lower than required, the employer for not providing safe working conditions, and the decedent for not reasonably protecting his own safety. However, I conclude a de novo review of the evidence shows most of the fault is attributable to the decedent.
The employer had contacted the decedent on the morning of the accident and warned of the presence of the low hanging electric lines. The testimony of the employer and others shows this is a hazard known to workers in logging operations. They must take special precautions to avoid electric lines. It was clear daylight. The line was visible. Other truck drivers testified they saw the line and avoided it. Despite this, the decedent loaded his truck under the line, and then threw the binding chain over the logs, contacting the line.
Under Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), the initial inquiry in apportioning fault is the degree of causation. In my view, the decedent's fault was a principal cause of this accident. He was in control of the truck and the chain and could have easily avoided the accident by looking for the electric line, of which he had been warned that very morning, and parking in a safe place or not throwing the chain into the line. Other truck drivers had safely loaded. The decedent himself had safely loaded once before.
I would apportion fault 40% to the employer, 40% to the decedent and 20% to VEMCO.
I also disagree with the majority awards of $250,000 to the widow as damages for the wrongful death of her estranged husband, and $250,000 to the widow and children for loss of economic support. These issues are not considered by us de novo. The clearly wrong, abuse of discretion rule of appellate review applies.
The jury verdict awarded zero to the widow for "Loss of her husband". The evidence shows they were married in 1981, had two children, separated in July of 1990, she obtained a judgment for child support of $300 per month, and she filed for divorce in February of 1991. They lived separate and apart for 14 months until the time of his death. The evidence was in conflict as to any reconciliation. She testified she planned to move back into his home, but admitted no date had been set and they remained separated.
It is clear from their award of zero for loss of her husband that the jury did not believe they would be reconciled. This was a fact question for the jury. Their decision was reasonable under the evidence. The appellate court should not substitute its judgment for that of the jury on this purely factual issue.
*225 As to the award of $250,000 for loss of economic support for the widow and children, this cannot be reconciled with the jury's award of zero for loss of her husband. The jury clearly did not believe they would reconcile. Without a reconciliation, she could claim no economic loss for herself. Only the children are entitled to loss of support. The children were respectively eight and nine years of age at the time of their father's death. They were receiving $300 per month court ordered child support from him. They are entitled to support only until age eighteen. In 1990 the decedent earned approximately $14,000 and $6,000 through the first eight months of 1991. Using a round figure of ten years during which the children would have been entitled to the court ordered child support, this would have totaled $36,000. Plaintiff's expert economist, Dr. Rice, estimated this figure at $39,000. Plaintiff's own counsel conceded during oral arguments that the award of $250,000 for economic loss could not be justified for the children.
In my view the highest award for loss of support of the children, which is reasonably supported by the evidence, is $50,000.
In conclusion, I would affirm the jury award of zero to the widow for loss of her husband and would award $50,000 to the children for loss of economic support.
For the reasons assigned, I dissent in part.
NOTES
[*] Honorable William A. Culpepper, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] Gauthier v. O'Brien, 606 So.2d 915 (La.App. 3d Cir.1992).