# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01306-COA

**VERNELL DAVEN MISKELL A/K/A VERNELL MISKELL**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:          05/24/2016
TRIAL JUDGE:          HON. JON MARK WEATHERS
COURT FROM WHICH APPEALED:          FORREST COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          OFFICE OF STATE PUBLIC DEFENDER
          BY: MOLLIE MARIE MCMILLIN
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
          BY: KATY TAYLOR GERBER
DISTRICT ATTORNEY:          PATRICIA A. THOMAS BURCHELL
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:          AFFIRMED - 11/07/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE IRVING, P.J., CARLTON AND GREENLEE, JJ.

### CARLTON, J., FOR THE COURT:

¶1.    Vernell Miskell appeals his conviction for aggravated assault and his sentence of twenty years in the custody of the Mississippi Department of Corrections (MDOC). Miskell filed a motion for a judgment notwithstanding the verdict (JNOV), or, in the alternative, a motion for a new trial. The trial court denied Miskell's posttrial motion. Miskell now appeals to this Court. Finding no error, we affirm.

## FACTS

¶2.    A Forrest County grand jury indicted Marquis Harris and Vernell Miskell for

aggravated assault in violation of Mississippi Code Annotated section 97-3-7(2)(a)(ii) (Supp. 2016) stemming from a shooting on the evening of December 21, 2004. Harris pleaded guilty to aggravated assault and then testified against Miskell at trial.

¶3. On December 21, 2014, Albert Pollard attended a house party in Hattiesburg, Mississippi. During the party, Pollard went outside to purchase marijuana from Harris. As Pollard pulled money out of his pocket to pay for the drugs, he heard someone say, "Freeze, don't move." Pollard testified that a man who he later identified as Miskell ran towards Pollard with a gun pointed at him. Pollard ran off, and he heard six shots fired from behind him. Pollard fell to the ground on the last shot, and then he felt someone going through his pockets. Pollard testified that he suffered three gunshot wounds, and he was in the hospital for two weeks. Pollard admitted at trial that he had been smoking marijuana and spice on the night of December 21, 2014, and he "was probably a little high," but he insisted that he "had clear vision" and could "still remember" the incidents that occurred.

¶4. Harris also testified against Miskell at trial. Harris stated that on December 21, 2014, he and Miskell walked to the house party. He testified that Miskell "disappeared," but then later returned to the party in a vehicle. Harris stated that while at the party, he and Pollard went outside to the vehicle Miskell returned in so Harris could sell Pollard spice and marijuana. Harris testified that he entered the vehicle to retrieve the drugs for Pollard, and when he looked up, Miskell had a gun in Pollard's face. Harris observed that Pollard tried to run away, but Miskell shot him. Harris said that after Miskell shot Pollard, Harris and Miskell "got in the car and . . . left." The record reflects that prior to Miskell's trial, Harris

2

pleaded guilty to the aggravated assault of Pollard.

¶5. The jury also heard testimony from Dreylen Hurd, the DJ for the party on the night of December 21, 2014. Hurd testified that someone at the party informed him that a person had been shot in the street. Hurd said that he went outside and approached Pollard, who was lying on the ground. Hurd rolled Pollard over and asked who shot him, and Pollard replied that "N.O." shot him. Hurd explained that "N.O." is Miskell's nickname.

¶6. Deandre Williams testified for the defense. Williams testified that at the party, he observed Harris with a gun in the pocket of his sweatshirt, and he saw Harris waving the gun around. Williams stated that he saw Harris leave the party, and Harris seemed angry that someone had taken his money. Williams testified that he believed Harris was mad at Pollard because he had lost money to Pollard in a dice game earlier in the night.

¶7. Miskell also testified in his own defense. According to Miskell's testimony, he and Harris walked to the party together. Miskell walked outside of the party to smoke and saw a friend, Decario Smith, outside by his car. Miskell went to Smith's car to talk to him when Miskell saw Harris come out of the party. Miskell stated that Harris seemed irritated or agitated. Miskell called his friend Derrick to come get him, and when Derrick arrived, Miskell told Harris he was ready to go. Miskell testified that Harris went back inside the party before returning back outside with Pollard. Miskell testified that as he was walking to Derrick's car, he saw Pollard run away, and then he observed Harris shoot Pollard four times. Harris and Miskell then jumped in Derrick's car and drove off. Miskell claimed that he did not know that Harris brought a gun to the party, and he testified that Harris seemed normal

that night.

¶8.    At the close of the State's case, the defense counsel made a motion for a directed verdict, which the trial court denied.  The jury ultimately found Miskell guilty of aggravated assault.  The trial court sentenced Miskell to twenty years in MDOC custody.

¶9.    Miskell's trial counsel filed a motion for a JNOV or, in the alternative, a new trial.  Miskell then filed a pro se motion for a new trial as well as a pro se notice of appeal.

¶10.    After the trial court denied Miskell's posttrial motions, Miskell's appellate counsel submitted a brief on his behalf, claiming: (1) the prosecutor improperly commented on Miskell's failure to call witnesses, and (2) the prosecutor made "send a message" comments during closing arguments.  Miskell then submitted a pro se supplemental brief, claiming: (1) the trial court erred in determining that the State's reasons for striking five African American jurors were race neutral; (2) the trial court erred in denying his motion for a directed verdict; (3) the State failed to prove the elements of the crime beyond a reasonable doubt; (4) the verdict was against the overwhelming weight of the evidence; (5) the trial  court erred in granting Jury Instruction S-5; (6) the trial court erred in refusing proposed Jury Instruction D-7; (7) the prosecutor misstated the law during closing arguments; (8) the cumulative effect of all errors resulted in an unfair trial; and (9) the cumulative effect of all errors resulted in plain error.  For the purposes of clarity in discussion, we will combine several of Miskell's assignments of error.

**DISCUSSION**

## I. *Batson*[1] Challenges

¶11.    Miskell asserts that the trial court erred in determining that the State's reasons for striking African American jurors were race neutral.  "Peremptory strikes alleged to be racially discriminatory are analyzed under *Batson v. Kentucky*, 476 U.S. 79 . . . (1986)." *Corrothers v. State*, 148 So. 3d 278, 304 (¶61) (Miss. 2014).

¶12.    When reviewing *Batson* determinations, this Court will only reverse if the trial court's factual findings "appear to be clearly erroneous or against the overwhelming weight of the evidence." *Cox v. State*, 183 So. 3d 36, 52 (¶54) (Miss. 2015).  Upon review of a trial court's determinations under *Batson*, appellate courts grant "great deference" to a trial court "because [the determinations] are based, in a large part, on credibility." *Id.*  We additionally recognize that "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Id.*

¶13.    Our supreme court has explained that when objecting to a peremptory challenge, the defendant must first "make a prima facie showing that race was the criteria for the exercise of the peremptory challenge[.]" *Id*. at 54 (¶64).  A defendant can establish a prima facie case of discrimination by showing the following:

> (1) that he is a member of cognizable racial group; (2) that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race; (3) and the facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.

*Corrothers*, 148 So. 3d at 305 (¶62).

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

¶14. Once the defendant has established a prima facie case of discrimination, the prosecution "has the burden to offer a race-neutral explanation for striking the potential juror[.]" *Cox*, 183 So. 3d at 54 (¶64). The explanation provided by the prosecution for striking the potential juror "need not be persuasive, or even plausible; so long as the reasons are not inherently discriminatory, they will be deemed race-neutral." *Corrothers*, 148 So. 3d at 305 (¶62). After the prosecution provides its race-neutral explanation, "the trial court must then determine whether the objecting party has met [its] burden to prove there has been purposeful discrimination in the exercise of peremptory challenges." *Cox*, 183 So. 3d at 54-55 (¶64) (internal quotation marks omitted).

¶15. The record herein reflects that following voir dire, the State challenged prospective jurors 6, 21, 25, and 32 for cause. The record reflects that prospective juror 6 was an African American man who informed the court during voir dire that he suffered from narcolepsy.

¶16. After the State made its challenges for cause, defense counsel commented that he was concerned about a low percentage of African American prospective jurors, observing that twelve out of thirty-nine prospective jurors were African American. However, defense counsel never actually objected to the prosecutor's challenges for cause as to these jurors, thus waiving this issue on appeal. *See Easter v. State*, 878 So. 2d 10, 24-25 (¶¶42-43) (Miss. 2004).

¶17. The record reflects the trial court then asked the State to tender the first twelve jurors, and the State struck prospective jurors 5, 6, and 10. (As stated, the State previously challenged prospective juror 6, an African American man, for cause.) The transcript reflects

6

that prospective juror 5 was African American, but the transcript does not reflect the race of prospective juror 10.[2]

¶18.    During the State's peremptory strikes, defense counsel only objected to the State striking prospective juror 5, an African American woman, based on the belief that a peremptory strike was being used as a result of discrimination. After defense counsel requested a race-neutral reason for striking prospective jurors, the trial court determined that defense counsel had not established a prima facie case of discrimination. However, the State still provided race-neutral reasons for striking the prospective juror. The transcript reflects the following exchange during the jury-selection conference:

MR. THORNTON:  Judge, I think we have to—the State's reasoning . . . for Number 5, Ms. Council. She is a black female. I would ask for a race[-]neutral reason for striking Ms. Council.

MR. HOOD:  You haven't made the—

THE COURT:  You haven't—you haven't[.]

MR. HOOD:  —*Batson* challenge yet, but just for the record purpose, I'll give a race[-]neutral reason. She was fidgety when she was doing the panel. She was [in]attentive. She seemed like she didn't want to be here. She was angry. Wouldn't make eye contact. Wouldn't sit still. I think she—I forgot her work history. Number 5. But that's the race[-]neutral reasons. But, again, a *Batson* procedure hasn't been met.

THE COURT:  Well, the Court's opinion, the Defense has not established the prima facie showing that the State is exercising its peremptory challenges on the basis of discrimination. The Court will accept the State's race[-]

_____

[2] In Miskell's motion for a JNOV or, in the alternative, a new trial, he alleges that prospective jurors 5, 6, 10, 21, and 24 were African American.

7

neutral reasons for eliminating or using the peremptory challenge on Erica Council. Ms. Council is the individual [who] just happened to be on my right just to the right of the podium, so if I'm looking at the podium, I'm looking at her. And the notes that I wrote down—she wasn't paying attention and that she worked the late shift and got off late. She was one of the ones, I think, that raised their hand in response to the defense question. So I think that's sufficient race[-]neutral reason to exercise a challenge. So let's move along.

¶19. The trial court also addressed defense counsel's concern regarding the number of African American jurors on the panel, opining:

All right. The Defense initiated our voir dire proceeding about challenging a use of a peremptory instruction by the State and asserted—well, desired a race[-]neutral reason. And it's my understanding and I stated on the record that although I did not think a prima facie case had been laid out for the use of peremptory instructions by the State in a rationally discriminatory matter, Mr. Hood volunteered race[-]neutral reasons for the exclusion of Juror Number 5, which I believe is Erica M. Council. The Court had made notes that agreed with what Mr. Hood was saying and for the reasons previously stated on the record, I felt like he gave a race neutral reason. We're now through Juror Number 12, and by my count, there are one, two, three African Americans on the jury.[3]

. . . .

And since the African American population is 37 percent of the population, total population of Forrest County, that is—that's very close to the actual percentage of the population.

¶20. The trial court additionally informed Miskell:

I can assure you that this Court is not going to allow the State of Mississippi to use its peremptory challenges . . . in a racially discriminatory manner. [A]nd I don't think they've done that. I didn't think they were doing that to start with. And as it turns out, . . . we have a number of African Americans on your jury that come pretty close to the racial makeup of the county[.]

---

[3] The transcript does not reflect which of Miskell's jurors were African American.

8

¶21. Our review of the record reflects that the trial court's determination that no *Batson* violation occurred herein was not clearly erroneous or against the overwhelming weight of the evidence. This issue lacks merit. *See Cox*, 183 So. 3d at 52 (¶54).

## II. Sufficiency of the Evidence

¶22. Miskell claims that the trial court erred in denying his motion for JNOV. Miskell specifically asserts that the State failed to prove the elements of the crime of aggravated assault beyond a reasonable doubt.

¶23. A motion for a JNOV challenges the legal sufficiency of the evidence. *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). The supreme court has held that appellate courts must review a challenge to the sufficiency of the evidence as follows:

> in the light most favorable to the State, giving the State the benefit of all favorable inferences reasonably drawn from the evidence. If the facts and inferences so considered point in favor of the defendant on *any* element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty, [we] must reverse and render.

*Henley v. State*, 136 So. 3d 413, 415-16 (¶8) (Miss. 2014) (internal citations and quotation marks omitted). The supreme court has also instructed that when "reviewing whether a verdict is supported by the evidence, [appellate courts] are required to look at the totality of the circumstances[.]" *Downs v. State*, 962 So. 2d 1255, 1259 (¶14) (Miss. 2007). As stated, Miskell was charged with aggravated assault pursuant to section 97-3-7(2)(a)(ii), which states that a person is guilty of aggravated assault if he "attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon[.]" We now turn to review the sufficiency of the evidence in this record supporting Miskell's conviction of aggravated

9

assault.

¶24.    As set forth in this opinion's statement of facts, Pollard and Harris provided testimony at trial supporting Miskell's conviction.  The record reflects that Pollard testified that he left the party to go outside and meet Harris.  Pollard stated that while Harris was inside of a car searching for marijuana to sell to Pollard, Pollard pulled out his money and began to count it.  He testified that he heard Miskell say, "Freeze; don't move."  Pollard explained that "when he said 'freeze; don't move,' I looked, you know, to see who it was, and I looked there.  You know, it was dark, but I still seen [sic] him."  Pollard testified that Miskell was standing about ten or fifteen feet away from him and "had the gun up pointed at me."  Pollard testified that he then ran off, but he heard six shots fired from behind him.  Pollard fell to the ground on the last shot, and then he felt someone going through his pockets.  Pollard testified that he suffered three gunshot wounds, and he was in the hospital for two weeks.

¶25.    As stated, Harris, Miskell's alleged accomplice, also testified that while he was in the car retrieving marijuana to sell to Pollard, he looked up and saw that Miskell "had a gun in [Pollard's] face, and [Pollard] tr[ied] to run.  Shot him."  Harris explained that at this point, Miskell and Pollard were standing right in front of the car, and he observed Miskell fire shots at Pollard.  Hurd, the DJ at the party, also testified that immediately after the shooting, Pollard stated that "N.O." shot him.  Hurd testified that "N.O." is Miskell's nickname.

¶26.    In applying the standard applicable to reviewing the sufficiency of the evidence and "giving the State the benefit of all favorable inferences reasonably drawn from the evidence[,]" we find no merit to this claim of error.  *See Henley*, 136 So. 3d at 415-16 (¶8).

10

### III.    Weight of the Evidence

¶27.    Miskell also claims the verdict was against the overwhelming weight of the evidence, and, as a result, the trial court erred by denying his motion for a new trial. When reviewing a trial court's denial of a motion for a new trial, this Court will not reverse "unless the verdict is so contrary to the overwhelming weight of the evidence that an unconscionable injustice would occur by allowing the verdict to stand." *Rollings v. State*, 192 So. 3d 1133, 1136 (¶14) (Miss. Ct. App. 2016) (citation omitted).

¶28.    Miskell specifically argues that because Pollard suffered gunshot wounds while attempting to run away, Pollard could not have known who shot him. Miskell also asserts that because Pollard admitted to using drugs prior to being shot, his identification of the shooter was unreliable. Miskell's argument fails to address Pollard's testimony that he saw Miskell pointing a gun at him, and that Harris also testified that he witnessed Miskell shoot Pollard. Thus, Harris's testimony corroborated the testimony of Pollard, and Hurd's testimony was consistent with that of both Pollard and Harris.

¶29.    In turning to the specific testimony in the record relevant to Miskell's argument, the record shows that Pollard testified that when he heard someone say, "Freeze; don't move," he looked to see who was speaking. Pollard testified that he then observed Miskell pointing a gun at him. Pollard also admitted he had been smoking marijuana and spice on the night of December 21, 2014, and "was probably a little high," but Pollard also testified that he "had clear vision" and could "still remember" the incidents that occurred.

¶30.    Regarding Harris's testimony, Miskell argues that Harris, his alleged accomplice,

11

never admitted to any role in the incident, and his testimony was self-serving. As stated, the record reflects that prior to Miskell's trial, Harris pleaded guilty to the aggravated assault of Pollard. However, the record reflects that the trial court provided the jury with the following instruction regarding Harris's testimony: "Harris is [Miskell's] alleged accomplice in this case. If you find that [Harris's] testimony is not supported by other evidence in this case, then you should consider his testimony cautiously and with great suspicion and determine whether it is reasonable, inconsistent, or has been impeached." The evidence in the record reflects that Harris's testimony was indeed consistent with and supported by the testimony of other witnesses. We recognize that "the jury is the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Lenoir v. State*, 222 So. 3d 273, 279 (¶29) (Miss. 2017).

¶31. Miskell also takes issue with the fact that Hurd, the DJ at the party, previously told police that Harris shot Pollard. At trial, Hurd acknowledged that his statement to the police was inconsistent with his trial testimony. Hurd explained that his statement to the police was based on what he was told by other people, and not what Pollard told him immediately after being shot. Hurd testified that immediately after the shooting, Pollard stated that Miskell shot him. The record shows that Hurd was subject to cross-examination. Again, "the jury is the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Id*.

¶32. Finally, Miskell argues that Sergeant Robert Sybert of the Hattiesburg Police Department asked the victim, through hospital staff, if he knew who shot him, and that the

12

victim's response was, "No." However, the record fails to establish what question was actually posed to the victim. Our review of the transcript shows the following exchange between the defense counsel and Sergeant Sybert during cross-examination:

Q.    So, Sergeant Sybert, you went to Forrest General to see who shot the victim, correct?

A.    That was one of the reasons I went there, sir.

Q.    . . . Okay. So once you made it to the hospital, ER staff directed you to a room where the victim was lying, right?

A.    Yes, sir.

Q.    And was a question asked, and did the victim respond[]?

A.    Yes, sir.

Q.    Did you hear what the victim response was?

A.    Yes, sir, I did.

Q.    Can you tell me what it was?

A.    The victim's response was no.

¶33.   The State argues that Pollard could have responded "no" to any number of questions. The record also reflects that later in the trial, Detective Tyson Fairley of the Hattiesburg Police Department testified that when he interviewed Pollard at the hospital after his surgery, Pollard provided "a description and a street name of the person who shot [him]." Detective Fairley testified that through his investigation, he determined Miskell to be the shooter.

¶34.   The record shows that both Pollard and Detective Fairley testified at trial and were subject to cross-examination by the defense counsel. As stated, "the jury is the sole judge

13

of the credibility of witnesses and the weight and worth of their testimony." *Lenoir*, 222 So. 3d at 279 (¶29). Furthermore, "[j]urors . . . have the duty[] to resolve the conflicts in the testimony they hear." *Turner v. State*, 818 So. 2d 1181, 1185 (¶10) (Miss. 2002).

¶35. After reviewing the record, we cannot say that "the verdict is so contrary to the overwhelming weight of the evidence that an unconscionable injustice would occur by allowing the verdict to stand." *Rollings*, 192 So. 3d at 1136 (¶14). Accordingly, we find no merit to Miskell's claim of error.

## IV. Jury Instructions

¶36. Miskell asserts that the trial court erred in granting jury instruction S-5. Miskell also asserts that the trial court erred in denying proposed jury instruction D-7. When reviewing a trial court's ruling on jury instructions, we recognize:

> Jury instructions are generally within the discretion of the trial court, and the settled standard of review is abuse of discretion. The instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. When read together, if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found[.] A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the trial court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Phillips v. State*, 179 So. 3d 1218, 1220 (¶7) (Miss. Ct. App. 2015) (quoting *Bailey v. State*, 78 So. 3d 308, 315-16 (¶20) (Miss. 2012)).

¶37. Miskell argues that the trial court erred in granting Jury Instruction S-5 because the instruction set forth an element outside of that required for proving aggravated assault. Jury Instruction S-5 stated:

14

A person charged with aggravated assault does not have to possess ill-will toward his victim(s). A person charged with aggravated assault does not even have to know the identity of a specific individual to commit an aggravated assault upon that person.

In this trial[,] this [r]ule of [l]aw means that [Miskell] did not have to possess ill-will toward [Pollard]. It also means that [Miskell] did not even have to know or recognize [Pollard] in order to commit an aggravated assault upon him.

¶38. In *Mack v. State*, No. 2016-KA-00035-COA, 2017 WL 2452014, at *11 (¶53) (Miss. Ct. App. June 6, 2017),[4] this Court discussed an identical jury instruction and found that the instruction provided a correct statement of the law. The *Mack* court cited to *Blanks v. State*, 542 So. 2d 222, 226 (Miss. 1989), for the proposition that "a person 'does not have to possess ill-will toward or even know the identity of a specific individual to commit an aggravated assault on that person.'" *Id*.

¶39. Miskell also claims that the trial court erred in refusing to grant proposed jury instruction D-7, which provided:

[Miskell] is charged with aggravated assault.

If the State failed to prove that:

1.    On or about December 21, 2014, in Forrest County;

2.    [Miskell] caused serious bodily injury to [Pollard], by unlawfully shooting [Pollard] with a handgun, beyond a reasonable doubt,

then you shall find [Miskell] "Not Guilty."

¶40. This Court has held that the trial court "may refuse an instruction which incorrectly

---

[4] At the time of this writing, no mandate has issued in *Mack* due to a pending motion for rehearing. M.R.A.P. 41(b). Therefore, the opinion is not final.

states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Dear v. State*, 966 So. 2d 218, 219-20 (¶5) (Miss. Ct. App. 2007) (citation omitted). In refusing proposed Jury Instruction D-7, the trial court herein found that the instruction was covered by Jury Instruction S-1, which provided as follows:

> The [c]ourt instructs the [j]ury that [Miskell] has been charged with the crime of [a]ggravated [a]ssault.
>
> If you find from the evidence beyond a reasonable doubt that:
>
> 1.   [Miskell], on or about December 21, 2014, in Forrest County, Mississippi;
>
> 2.   knowingly caused bodily injury to [Pollard], with a deadly weapon, to wit: gun, by shooting [Pollard] with a gun; and
>
> 3.   that such behavior was not done in necessary self defense, accident, or misfortune; then you shall find [Miskell], guilty of [a]ggravated [a]ssault.
>
> If the State has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find [Miskell], not guilty of [a]ggravated [a]ssault.

¶41.   Upon review, the record reflects that proposed Jury Instruction D-7 was "covered fairly" by Jury Instruction S-1. *See id.* Furthermore, precedent reflects that Jury Instruction S-5 constituted a correct statement of law. *See Blanks*, 542 So. 2d at 226. We thus find this issue lacks merit.

## V.   Prosecutorial Misconduct

¶42.   Miskell argues that the prosecutor made inappropriate comments during closing argument. Miskell specifically takes issue with the prosecutor's suggestion that Miskell

16

possessed a duty to present witnesses in his defense and the prosecutor's statement that the jury should convict Miskell in order to take a stand against gangs.

¶43. "The standard of review that appellate courts must apply to lawyer misconduct during . . . closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Jackson v. State*, 174 So. 3d 232, 236 (¶9) (Miss. 2015). "Prosecutors are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Wilson v. State*, 194 So. 3d 855, 864 (¶30) (Miss. 2016) (internal quotation marks omitted). However, "[t]he prosecutor may comment upon any facts introduced into evidence, and he may draw whatever deductions and inferences that seem proper to him from the facts." *Id*. (quoting *Galloway v. State*, 122 So. 3d 614, 643 (¶72) (Miss. 2013)). Additionally, this Court, citing *Dora v. State*, 986 So. 2d 917, 923-24 (¶¶13-14) (Miss. 2008), has recognized that during closing argument, the State is allowed to comment "on the credibility and veracity of the testimony provided by . . . [a] witness." *Lathan v. State*, 164 So. 3d 484, 489 (¶21) (Miss. Ct. App. 2014); *see also Pitchford v. State*, 45 So. 3d 216, 234 (¶67) (Miss. 2010).

¶44. The record reflects that during his closing argument, the prosecutor claimed that Miskell was at a gang-related party, stating:

> This defendant was hanging out with those people that you saw coming and testifying, and look. They're all rough around the edges. They're all doing stuff they wouldn't have to do. That is what it is. But we have to take a stand on it. We have to say you have to be held accountable for what you do. If you fire bullets out in the street, you're going to be held accountable for it. If you shoot a gang member, if the [six] bullets go and shoot a little kid in the house,

17

you've got to be held accountable for it.

. . . .

The gang stuff here is a problem. It's not as bad as places like Chicago, but it's a problem. It's simply an issue of can't control what parents let their young adults do. Can't control what a young adult try to do. You can't tell a parent to teach their kid to be responsible and not to go to places where you see that kind of activity. . . . But what's our obligation? It's to say we will not allow shootouts in Hattiesburg. We will not allow people to be shot. We will not allow crooked people to point fingers at each other.

¶45. The prosecutor also stated:

Kids have a right to have a party. Kids don't have a right to go sell drugs. Kids have a right to go gather and get together with each other. They don't have a right to have shootouts. Communities don't have a right to live in fear because we have shootouts and guns firing out in some neighborhoods. And in my mind and this jurisdiction and this office, the line will be drawn. . . . If you draw a line, if you draw a line, and hold him accountable, this defendant will be sentenced by that [j]udge. He will make the final determination. Right there. You can't point fingers at each other and have one of you walking away. You can't. The line has to be drawn. You can't be Chicago. We can't be other places. The line has to be drawn. Fairness, responsibility, accountable for your actions. It's a simple principle. It's been around since the ages. If it goes well, everybody lives a wonderful life, and everybody is happy. If you lose that—if you lose that basic foundation, there's your problem. This case was built on I.D. of the victim supported by the co-defendant, supported by both of them having been seen with the gun. Whatever his defense is, he's lying. You're not getting arrested and not say I saw him do it. You're not giving the names of your witnesses. You're not mentioning it. You don't just forget about it in opening statement. For two years you don't tell anybody. You're lying because you both have to be held responsible, and let him sentence him. I'm going to ask you to go back there and find this defendant, seek out the form of the verdict form, write on a sheet of paper we find the defendant guilty. Draw your line.

¶46. We recognize that our supreme court has held that prosecutors may not "encourage juries to use their verdict to 'send-a-message' to the public or to other potential criminals." *Brown v. State*, 986 So. 2d 270, 275 (¶11) (Miss. 2008). "This is because the issue which

18

each juror must resolve is not whether or not he or she wishes to send a message but whether or not he or she believes that the evidence showed the defendant to be guilty of the crime charged." *Grindle v. State*, 134 So. 3d 330, 347 (¶71) (Miss. Ct. App. 2013) (citation omitted). When reviewing a send-the-message claim, this Court considers two threshold questions, followed by a two-prong test. *Id*. at 348 (¶72). The threshold questions are: "(1) did defense counsel object, and (2) was the comment uninvited by the defense." *Id*. (citation omitted).

¶47. The record before us reflects that the defense counsel failed to object to comments now raised on appeal. "However, even in the absence of a contemporaneous objection, we will review on appeal a claim that a prosecutor made an improper send-a-message argument if the argument is so inflammatory that the trial judge should have objected on his own motion." *O'Connor v. State*, 120 So. 3d 390, 399 (¶23) (Miss. 2013) (internal quotation marks omitted).

¶48. In addressing whether the prosecutor's statements constituted a send-a-message argument, we find that the record reflects that the statements were invited by the defense counsel and that the prosecutor commented on the actual evidence offered at trial. The prosecutor's statements conveyed that even bad people, including gang members, can be victims, and that shooting a gang member is a crime that should be accounted for under the law. The record also reflects that the prosecutor commented on the actual testimony provided at trial by Miskell and other defense witnesses. The prosecutor argued that Miskell's testimony was not truthful, and that Miskell was lying in his trial testimony

wherein he claimed that he saw Harris shoot Pollard. The prosecutor was allowed to comment on the credibility of the testimony and evidence presented at trial. *See Lathan*, 164 So. 3d at 489 (¶21).

¶49. Regarding Miskell's argument that the prosecutor improperly commented on Miskell's failure to call witnesses, our review of Miskell's appellate brief reveals that Miskell failed to present any argument or authority in support of his claim. This Court has held that "issues unsupported and not argued are abandoned and need not be considered" on appeal. *Thibodeaux v. State*, 652 So. 2d 153, 155 (Miss. 1995) (citation omitted).

¶50. Miskell also takes issue with the prosecutor's statement that "if one of you are guilty, you're both guilty." During his closing argument, the prosecutor stated:

> If [Harris] is guilty of aggravated assault, so is [Miskell]. . . . And that's what this comes down to. If we're going to hold one of them accountable for setting that guy up out there and ending up shooting him, you've got to hold them both accountable. . . . We will not allow you to point fingers and walk away because if one of you are guilty, you're both guilty.

¶51. The record reflects that the defense counsel objected, arguing, "If one is guilty; therefore, both are guilty. That's an inaccurate and improper statement of the law." The prosecutor responded and explained: "It's an argument. It's not a law. It's an argument." The trial court overruled the defense counsel's objection, finding that the prosecutor was "simply making an argument." The record additionally reflects that the trial court instructed the jury through Jury Instruction C-1 that "[a]rguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but are not evidence. If any argument, statement or remark has no basis in the evidence, then you should disregard

20

that argument, statement or remark." The trial court also instructed the jury through Jury Instruction D-5: "You may consider [Harris's] previous conviction [for the aggravated assault of Pollard] for the limited purpose of determining [Harris's] truthfulness." Additionally, a review of the prosecutor's entire closing argument reflects that when taken in context of all of the evidence, including defense evidence, the prosecutor only commented on actual evidence in the case and the credibility thereof. *See Wilson*, 194 So. 3d at 864 (¶30).

¶52. As stated, we review claims of prosecutorial misconduct during closing arguments for the determination of "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Jackson*, 174 So. 3d at 236 (¶9). We find that the prosecutor's comments during closing argument failed to cause unjust prejudice to Miskell; accordingly, we find this issue lacks merit.

## VI. Cumulative Error

¶53. Finally, Miskell claims that the cumulative effect of all errors resulted in an unfair trial and plain error. Under the cumulative-error doctrine, "individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Rogers v. State*, 205 So. 3d 660, 665 (¶17) (Miss. Ct. App. 2015) (citation omitted). "However, reversal based upon cumulative error requires a finding or findings of error." *Id.* (citation omitted).

21

¶54. Since we find no error on any of Miskell's claims, we accordingly find that "no cumulative or plain error results to warrant a reversal." *Id*. at 666 (¶25); *see also Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007). We therefore affirm the circuit court's judgment.

¶55. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR. TINDELL, J., NOT PARTICIPATING.**