# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00519-COA

**WILLIAM ISSAC ARNOLD A/K/A WILLIAM ARNOLD**    APPELLANT

**v.**

**STATE OF MISSISSIPPI**    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/23/2022 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | MICHAEL W. CROSBY TYLER RAY HEFLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/08/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McCARTY AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.    William Arnold appeals his convictions in the Harrison County Circuit Court of three counts of sexual battery.  On appeal, Arnold argues that the trial court erred in allowing the State to present improper character evidence and that the State committed repeated instances of prosecutorial misconduct.

¶2.    Finding no error, we affirm the convictions and sentences.

## FACTS

¶3.     B.A.[1] was born in 1990 to Arnold and Shanta Keyes.[2] Arnold and Keyes were married in 2001, separated in 2004, and eventually divorced in 2007. During her parents' separation and after their divorce, B.A. lived with Arnold. During B.A.'s high school years, she and Keyes were estranged and did not communicate.

¶4.     In 2018, B.A. alleged that Arnold had sexually abused her on a regular basis from the time she was thirteen years old until she graduated from high school. B.A. reported the abuse to the police, and Arnold was indicted on three counts of sexual battery that allegedly occurred between 2004 and 2009 in violation of Mississippi Code Annotated section 97-3-95(1) (Rev. 2020).

¶5.     Arnold's trial was held in November 2022. At trial, B.A. testified that when she was twelve years old, Arnold started kissing and touching her inappropriately, and when she was thirteen years old, Arnold had sexual intercourse with her for the first time. B.A. described the first instance of sexual abuse, testifying that one afternoon after school, Arnold "started kissing on [her], he started touching [her] and taking down [her] pants, and he put his mouth on [her] privates, and afterwards he stuck his penis in [her] vagina and had sex with [her]." B.A. stated Arnold continued to have sexual intercourse with her on a regular basis until she graduated from high school and moved out of Arnold's house.

¶6.     B.A. testified that no one else was ever present in the room when Arnold sexually

---

[1] We will use initials for the victim and the two character-evidence witnesses to protect their identities. *See infra* ¶11.

[2] The record reflects that in 2018, B.A. transitioned from female to male and changed her name. Because the sexual abuse occurred before the transition, we will refer to the victim as a female throughout the opinion.

abused her. She explained that she would try to stop the abuse by pushing Arnold away from her or locking the door to her bedroom, but Arnold would pick the lock. B.A. testified that when Arnold observed her "frustration" with the abuse, he would punish her by refusing to let her drive his truck to school. B.A. explained that she would then "have to go to work with him early in the morning [and] sit in the truck until it was time for [her] to go to school because [Arnold] didn't want [B.A.] to drive his truck because [she] didn't want to have sex with him."

¶7.     When she was sixteen years old, B.A. discovered that she was pregnant with Arnold's child. B.A. informed Arnold about the pregnancy, and he arranged for his niece to take B.A. to a clinic to receive an abortion. B.A. testified that she was too far along in her pregnancy to undergo an abortion at that clinic, so Arnold drove B.A. to a clinic in Atlanta, Georgia, that ultimately performed the abortion. Arnold's niece, Tonia Price, testified at trial and confirmed that Arnold asked her to take sixteen-year-old B.A. to a clinic for an abortion.

¶8.     B.A. testified that she became pregnant by Arnold a second time after she graduated from high school, and the pregnancy ended in a miscarriage. B.A. testified that she knew Arnold was the father in both pregnancies because he was the only person with whom she had ever had sexual intercourse. B.A. stated that after her miscarriage, Arnold's abuse stopped.

¶9.     In 2012, B.A. moved to North Carolina and then later settled in Atlanta. In 2018, while she was living in Atlanta, B.A. began therapy sessions with Dr. Edith Fresh, a clinical psychiatrist. During her therapy sessions, B.A. eventually disclosed Arnold's sexual abuse.

3

B.A. testified that this was the first time she had ever fully shared details of the abuse with anyone. B.A. explained that it took her a long time to disclose the abuse because Arnold was the only family member who was present in her life, and she feared that if she reported the abuse, she would be left with no family and nowhere to live. B.A. also testified that she had wanted to seek counseling in the past, but Arnold "always talk[ed] [her] out of" going to counseling.

¶10. Dr. Fresh testified at trial and confirmed that B.A. reported the sexual abuse to her during a counseling session. Dr. Fresh testified that B.A.'s first counseling appointment was in May 2018, and at that appointment, B.A. informed Dr. Fresh that she was planning to transition genders from female to male. Dr. Fresh explained that people seeking to undergo gender transition surgery are often required to receive a psychiatric evaluation from a counselor before being approved for the surgery. Dr. Fresh stated that B.A. initially began seeing her to meet the mental health requirements needed to obtain gender transition surgery. However, after Dr. Fresh provided the necessary approval for B.A. to obtain her transition, B.A. continued to see Dr. Fresh for counseling. After approximately five counseling sessions, B.A. informed Dr. Fresh that Arnold had sexually abused her during her childhood. Dr. Fresh testified that B.A.'s behavior, including protection of her perpetrator and delayed reporting of the abuse, was consistent with that of a victim of sexual abuse.

¶11. The jury also heard testimony from M.S. and N.P., two of B.A.'s childhood friends who testified that Arnold made sexual advances or sexually abused them when they were children. M.S. is the same age as B.A., and N.P. is a year younger than B.A.

4

¶12. M.S. testified that when she was twelve years old, Arnold made inappropriate sexual advances toward her. M.S. stated that she and her older sister were at Arnold's house spending the night with B.A., and the three girls were sleeping in B.A.'s bed. M.S. recalled that she had trouble sleeping, so she got out of bed and moved to the couch in the living room. M.S. fell asleep on the couch and eventually woke up to find Arnold sitting next to her. M.S. testified that at that time, she and Arnold were alone in the living room. According to M.S., Arnold confided in her about his troubled relationship with Keyes and then asked M.S. for a kiss. M.S. responded, "No," and then got up and went back into B.A.'s bedroom.

¶13. M.S. testified that as she and her sister prepared to go home the next morning, Arnold offered ice cream sandwiches to the girls. M.S. stated that her sister and B.A. took an ice cream sandwich and then went outside to get their bicycles, so she and Arnold were alone in the house together. After some hesitation, M.S. accepted the ice cream sandwich and sat down in a chair. Arnold then faced M.S., kneeled down in front of her on one knee, and placed a hand on each arm of the chair. Arnold asked M.S. for a kiss, and she responded, "No." M.S. described Arnold as "adamant" about getting a kiss, so she got up and walked out of the house.

¶14. M.S. testified that she was shocked by Arnold's behavior. M.S. stated that Arnold was a friend of her family, and she described him as "like an uncle" to her. M.S. testified that she never told anyone about Arnold's behavior because she "didn't really have support in [her] family" and because Arnold "was a friend of the family."

5

¶15. N.P. testified that in December 2008 when she was sixteen years old, Arnold sexually assaulted her. At the time, Arnold was at N.P.'s house repairing a broken toilet. N.P. testified that she was standing in the pantry looking for a snack when Arnold came up behind her, wrapped his arms around her waist, and inserted two of his fingers into her vagina. N.P. stated that Arnold "rubbed" his fingers around inside of her, then pulled them out, and smelled them. Arnold then asked N.P. if she "[knew] what oral sex was and did [she] want to practice."

¶16. N.P. testified that during the abuse, she "froze." When Arnold asked her if she wanted to practice oral sex, N.P. did not respond verbally but pushed Arnold away from her. N.P. then opened the front door to the house and stood there, looking at Arnold. N.P. testified that Arnold walked out without saying anything. After he left, N.P. locked the door.

¶17. N.P. testified that during this incident, her younger sister and two cousins were present in the home, but none of them were in the room with her and Arnold during the abuse. N.P. testified that Arnold eventually called her and asked her not to tell anyone what happened. Arnold told N.P., "[I]f you need anything, you can call me, whether it's money or to fix your car, anything."

¶18. N.P. testified that the only people she told about the abuse were her then-boyfriend and her sister. Like M.S., N.P. described Arnold as "a friend of the family." N.P. also testified that she and B.A. were childhood friends, and they were one grade apart in school.

¶19. Arnold also testified at trial, and he denied sexually abusing B.A., M.S., and N.P. Arnold claimed that he had a loving relationship with B.A. and testified that he was "just like

any other dad." He acknowledged that B.A. had an abortion and suffered a miscarriage, but Arnold denied impregnating B.A.

¶20. The jury ultimately returned a verdict finding Arnold guilty of three counts of sexual abuse. The trial court sentenced Arnold to serve life in the custody of the Mississippi Department of Corrections for Count I, thirty years for Count II, and thirty years for Count III. The trial court ordered the sentences to run concurrently with one another.

¶21. Arnold filed a motion for judgment notwithstanding the verdict or a new trial, which the trial court denied. This appeal followed.

## DISCUSSION

### I. Mississippi Rule of Evidence 404(b)

¶22. On appeal, Arnold argues that the trial court erred by allowing testimony from M.S. and N.P., who both alleged that Arnold made sexual advances or sexually abused them when they were children. Arnold asserts that M.S. and N.P.'s testimony was unfairly prejudicial character evidence and therefore inadmissible under Mississippi Rules of Evidence 404 and 403. Arnold further claims that the trial court failed to specifically identify an appropriate purpose for the admission of the testimony and failed to give the jury an appropriate limiting instruction.

¶23. We review a trial court's admission of evidence for an abuse of discretion. *Boggs v. State*, 188 So. 3d 515, 519 (¶9) (Miss. 2016). We will affirm a trial court's evidentiary rulings "unless they affect a substantial right of the complaining party." *Id*.

¶24. Mississippi Rule of Evidence 404(b)(1) prohibits the admission of evidence of "a

7

crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." MRE 404(b)(1). However, evidence of a crime, wrong, or other act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). Our supreme court has clarified that "[t]he purposes listed in Rule 404(b) are not exhaustive; they simply are examples of noncharacter purposes for which evidence of other crimes, wrongs, or acts may be admitted." *Boggs*, 188 So. 3d at 519 (¶11). Additionally, "the mere fact that evidence offered for noncharacter purpose(s) bears some reflection on the defendant's character does not bar its admissibility under Rule 404(b)." *Green v. State*, 89 So. 3d 543, 551 (¶18) (Miss. 2012).

¶25. If a trial court finds that evidence is admissible under Rule 404(b), the evidence must then be "filtered through Rule 403," which allows the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Derouen v. State*, 994 So. 2d 748, 756 (¶20) (Miss. 2008); *accord* MRE 403. Evidence admitted under Rule 404(b) and filtered through Rule 403 must also be "accompanied by an appropriately-drafted limiting or cautionary [jury] instruction." *Green*, 89 So. 3d at 549 (¶15) (quoting *Derouen*, 994 So. 2d at 756 (¶20)).

¶26. In the case before us, the State filed a pre-trial notice of its intent to call M.S. and N.P. as witnesses under Rule 404(b) for the purpose of showing Arnold's motive, intent, plan,

opportunity, and absence of mistake or accident. The State also provided a summary of M.S.'s and N.P.'s anticipated testimonies, stating that M.S. would testify that when she was twelve years old, Arnold made inappropriate sexual advances toward her, and N.P. would testify that when she was sixteen years old, Arnold sexually abused her.

¶27. The trial court held a pre-trial hearing on the State's motion. At the hearing, Arnold asked the court to exclude the proposed testimonies from M.S. and N.P., arguing that their testimony would be inadmissible as hearsay and character evidence. Arnold further asserted that M.S.'s and N.P.'s claims of sexual abuse and inappropriate conduct were not relevant because the alleged conduct occurred decades ago and was unsubstantiated. In response, the State maintained that the testimony was admissible pursuant to the exceptions set forth in Rule 404(b); namely, to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b).

¶28. After hearing arguments and considering caselaw, the trial court denied Arnold's motion to exclude the testimonies of M.S. and N.P. The trial court acknowledged that Rule 404 prohibits using a defendant's character or actions to prove that he acted in conformity with those actions on a particular occasion. However, the trial court determined that M.S.'s and N.P.'s testimonies were admissible under 404(b) for the limited purpose of proving "motive, opportunity, lack of mistake, [and] plan." The trial court then applied the balancing test under Rule 403 and found that, in this particular case, the probative value of M.S.'s and N.P.'s testimonies was not substantially outweighed by the danger of unfair prejudice.

¶29. At trial, the jury heard testimony from M.S. and N.P. detailing Arnold's sexual

advances and sexual abuse that occurred when they were children. M.S. testified that she was twelve years old, Arnold asked her for a kiss one evening when she was spending the night with B.A. M.S. refused. Arnold also asked her for a kiss the next morning, and she again refused. N.P. testified that when she was sixteen years old, Arnold approached her from behind, inserted two of his fingers into her vagina, smelled his fingers, and then asked her if she wanted to practice oral sex with him.

¶30. On appeal, Arnold argues that the State intended to use M.S.'s and N.P.'s testimonies for the inadmissible purpose of showing that Arnold acted in conformity with the behavior described by M.S. and N.P. when he allegedly sexually abused B.A. In support of his argument, Arnold asserts that during the State's closing argument, the prosecutor stated "It wasn't just her. You heard from [N.P.]." Arnold claims that the prosecutor's statement is simply another way of saying, "[T]his is what he does . . . this is his character[.]"

¶31. The supreme court has held that "evidence of a sexual offense, other than the one charged, which involves a victim other than the victim of the charged offense for which the accused is on trial[,]" may be considered by the jury "if properly admitted under Rule 404(b), filtered through Rule 403, and accompanied by an appropriately-drafted limiting or cautionary instruction." *Green*, 89 So. 3d at 549 (¶15) (quoting *Derouen*, 994 So. 2d at 756 (¶20)). In sexual-assault cases involving minor victims, the supreme court has found that evidence of other sexual misconduct was admissible and not unduly prejudicial where the evidence demonstrated that the "defendant's means of accomplishing [pedophilic sexual activities] on past occasions bear substantial resemblance to each other and with the present

10

offense," thus showing proof of motive and a common plan or scheme. *Gore v. State*, 37 So. 3d 1178, 1185-86 (¶18) (Miss. 2010); *see also Boggs*, 188 So. 3d at 521 (¶¶17-18); *Young v. State*, 106 So. 3d 775, 780 (¶¶17-18) (Miss. 2012); *Green*, 89 So. 3d at 552 (¶20). The supreme court explained that evidence of sexual misconduct that is "similar" to the charged offense "supports an inference . . . of a common plan, scheme, or system, utilized repeatedly to perpetrate separate but very similar crimes." *Green*, 89 So. 3d at 551 n.19 (citation and internal quotation marks omitted).

¶32. In the case before us, we find that M.S.'s and N.P.'s allegations against Arnold "b[ore] a striking resemblance to the charged offense" and demonstrated that Arnold's "means of accomplishing [pedophilic sexual activities] on past occasions bear substantial resemblance to each other and with the present offense." *Boggs*, 188 So. 3d at 521 (¶17); *Gore*, 37 So. 3d at 1186 (¶18). We therefore find that M.S.'s and N.P.'s testimonies were admissible under Rule 404(b) because they showed proof of motive and established a common plan or scheme. At trial, B.A. testified her father abused her from the time she was thirteen years old until she graduated from high school. B.A. testified that the abuse occurred when no one else was around, and she stated that she was surprised and also confused as to why her father would sexually abuse her. M.S. and N.P. also testified that Arnold's behavior surprised them and caught them off guard and that no one else was present during the incidents. Like B.A., M.S.'s and N.P.'s testimonies reflect that Arnold used his position of trust to engage in inappropriate conduct and abuse. M.S. and N.P. testified that they were friends with B.A. and that Arnold was a friend of the family. M.S. even described him as

"like an uncle." Both girls were similar in age to B.A. when the abuse occurred—M.S. testified that Arnold's inappropriate sexual conduct occurred when she was twelve years old, and N.P. testified that she was sixteen years old when Arnold sexually abused her. Arnold's sexual abuse of M.S. and N.P. escalated in a similar manner to his sexual abuse of B.A. B.A. testified that when she was twelve years old, Arnold's abuse was limited to kissing and inappropriate touching. M.S., who is the same age as B.A., was twelve years old when Arnold tried to kiss her. As B.A. grew older, Arnold's sexual abuse escalated from kissing to sexual penetration. Similarly, Arnold's sexual abuse of sixteen-year-old N.P., who is a year younger than B.A., was more extreme than his inappropriate conduct with twelve-year-old M.S.

¶33. Arnold maintains that M.S.'s and N.P.'s testimonies are not relevant because the alleged misconduct and abuse involving M.S. and N.P. was too remote in time and was different from the type of abuse alleged by B.A. However, we find no merit to Arnold's arguments. This Court has held that "[i]n the context of child-sexual-abuse cases, even evidence of remote past sexual-abuse allegations may be admitted for a proper purpose under Rule 404(b), especially when coupled with an appropriate limiting instruction to the jury." *Shoemaker v. State*, 256 So. 3d 604, 614 (¶36) (Miss. Ct. App. 2018). Additionally, the supreme court has held that differences in the type of alleged abuse, whether the severity of the abuse or the ages of the victims, "[does] not negate [a defendant's] substantially similar opportunities and pedophilic motives" for purposes of Rule 404(b) admissibility. *McGrath v. State*, 271 So. 3d 437, 442 (¶18) (Miss. 2019).

12

¶34. We also find that the testimony of M.S. and N.P. was properly "filtered through" Rule 403. The transcript reflects that after finding that the testimony was admissible under Rule 404(b), the trial court then "considered the probative-versus-prejudicial nature of the testimony at issue." *Butler v. State*, 300 So. 3d 550, 555-59 (¶34) (Miss. Ct. App. 2020). As stated, the trial court found that the probative value of M.S. and N.P.'s testimony was not substantially outweighed by the danger of unfair prejudice.

¶35. Finally, we find that the record does not support Arnold's claims that the trial court failed to give the jury an appropriate limiting instruction and failed to specifically identify an appropriate purpose for the admission of this evidence. First, the record clearly shows that the trial court did give an appropriate limiting instruction. Jury instruction S-8A was given to the jury and states as follows:

> The [c]ourt instructs the [j]ury that acts testified to by [M.S.] and [N.P.] are acts relating to charges for which the defendant is not presently on trial and are to be considered only for the limited purpose of showing proof of motive, opportunity, intent, common plan, and scheme. You cannot and must not simply infer that the defendant acted in conformity with his previous acts and that he is therefore guilty of the charges for which he is presently on trial.

The language of this instruction is nearly identical to the limiting instruction provided to the jury in *Gore*, 37 So. 3d at 1184 (¶14). In *Gore*, the supreme court held that the limiting instruction in that case satisfied the requirement of an "appropriately-drafted" limiting instruction as mandated by *Derouen*, 994 So. 2d at 756 (¶20). *Gore*, 37 So. 3d. at 1187 (¶21).

¶36. Additionally, we recognize that the supreme court has held that "the trial court's failure to identify the specific applicable exception(s) under Rule 404(b) does not require

13

reversal." *Green*, 89 So. 3d at 551 (¶17). However, the transcript shows that the trial court in this case *did* identify the specific applicable exceptions under Rule 404(b). After hearing arguments regarding the admissibility of M.S.'s and N.P.'s testimonies, the trial court made an on-the-record finding that the testimonies "certainly pass[] [the requirements of] 404(b) to prove [Arnold's] motive, opportunity, lack of mistake, plan."

¶37. The record shows that the trial court satisfied the supreme court's requirement that evidence of prior sexual assault or misconduct must be "properly admitted under Rule 404(b), filtered through Rule 403, and accompanied by an appropriately-drafted limiting or cautionary instruction to the jury[.]" *Derouen*, 994 So. 2d at 756 (¶20). We therefore find that the trial court did not abuse its discretion in admitting M.S.'s and N.P.'s testimonies.

## II. Prosecutorial Misconduct

¶38. Arnold also argues that the State committed repeated instances of prosecutorial misconduct during its opening statements and closing arguments. Arnold asserts that the cumulative effect of this prosecutorial misconduct deprived him of his right to a fundamentally fair trial and therefore warrants reversal. When reviewing claims of prosecutorial misconduct, we will reverse if "[the] prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice[.]" *Goodin v. State*, 787 So. 2d 639, 645 (¶18) (Miss. 2001).

¶39. "Under the cumulative-error doctrine, individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *White v. State*, 228

14

So. 3d 893, 905 (¶29) (Miss. Ct. App. 2017). "[R]eversal based upon cumulative error requires a finding or findings of error." *Miskell v. State*, 230 So. 3d 345, 360 (¶53) (Miss. Ct. App. 2017).

### A. Closing Arguments

¶40. Arnold asserts that during closing arguments, the prosecutors[3] made several comments vilifying Arnold and also made an improper "send-a-message" argument. The record shows that Arnold's defense counsel did not object to any of these allegedly improper comments during closing arguments; accordingly, Arnold's arguments are procedurally barred on appeal. *Evans v. State*, 226 So. 3d 1, 31 (¶78) (Miss. 2017). However, "we will review such a claim if the prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion." *Ambrose v. State*, 254 So. 3d 77, 129-30 (¶165) (Miss. 2018).

¶41. In reviewing Arnold's claims of prosecutorial misconduct, we recognize that while attorneys "are allowed a wide latitude in arguing their cases to the jury[,]" they may not make arguments that "are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Sheppard v. State*, 777 So. 2d 659, 661 (¶7) (Miss. 2000). Additionally, "any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety." *Ronk v. State*, 172 So. 3d 1112, 1137 (¶60) (Miss. 2015). Reversible error occurs when "the natural and probable effect of the improper argument of the prosecuting attorney is to create such an unjust prejudice against the accused as to result in a decision influenced by the prejudice so

---

[3] The transcript reflects that two prosecutors made closing arguments in this case.

created." *Murry v. State*, 359 So. 3d 1104, 1113 (¶27) (Miss. Ct. App. 2022).

### 1. Vilification of Arnold

¶42. Arnold takes issue with the following statements made by the prosecutors during closing arguments:

> Ladies and gentlemen of the jury, it's been said that a little girl's first true love is her daddy. You may have heard of little girls—they are always going to dream of the person they are ever going to marry is their daddy, but no little girl dreams of what this defendant did to [B.A.]. No little girl dreams of being completely isolated from her entire family except her daddy. No little girl dreams of her daddy viewing her only as a sexual object that he is going to molest repeatedly. No little girl dreams of her daddy getting her pregnant twice. No little girl dreams of having to abort her daddy's child. William Arnold, the defendant, may have been [B.A.]'s biological father, but he was not her daddy. It may be hard to think of the fact that fathers may be able to do or capable of doing such things to little girls.
>
> . . . .
>
> [W]e can all agree that [B.A.] does not deserve to be molested by [her] dad.

¶43. Arnold also asserts that the following comments during the State's rebuttal closing arguments were improper:

> He got a cousin, his niece, that barely knew him to go have an abortion. [W]as he too busy to do that? [C]ould a father not take their child?
>
> . . . .
>
> [N]o one should ever be molested, especially by your father. This is not a father.

¶44. Arnold claims that the prosecutors made these comments for the purposes of vilifying him and inflaming the jury. This Court has cautioned that prosecutors "should be careful not to indulge in personal abuse or vilification of the defendant and should not appeal to passion

16

and prejudice." *White*, 228 So. 3d at 911 (¶54) (quoting *Stewart v. State*, 263 So. 2d 754, 758-59 (Miss. 1972)).

¶45.     In a sexual-abuse case involving a minor, this Court found that a prosecutor's misconduct rose to the level of reversible error where the prosecutor repeatedly called the defendant a "pedophile" and a "child molester." *White*, 228 So. 3d at 911 (¶55).  This Court explained the prosecutor's "repeated vilification of [the defendant] during . . . closing arguments served no other purpose than to inflame the passion and prejudice of the jury against [the defendant]." *Id*.

¶46.     In contrast, this Court found no prosecutorial misconduct in a sexual-abuse case involving a minor where the prosecutor called the defendant a "child molester" but did not refer to the defendant as a pedophile. *Blackwell v. State*, 273 So. 3d 801, 811 (¶29) (Miss. Ct. App. 2019).  In *Blackwell*, we distinguished the facts from those in *White*, explaining that "[n]either of the prosecutors ever called [the defendant] a pedophile in front of the jury." *Id*. After viewing the prosecutor's comment "in appropriate context," this Court ultimately determined that the prosecutor was not vilifying the defendant but, rather, "was arguing that [the defendant] was guilty of the charges he faced—two counts of gratification of lust by improperly touching a child." *Id*.  This Court explained that instead of using the full language of the charge against the defendant, "the prosecution used a shorter, more familiar synonym for the crime.  Said differently, the comments at issue were tethered to the legal and factual circumstances of the case, so they were 'fair argument based upon the testimony and evidence[.]'" *Id*. (quoting *Divine v. State*, 947 So. 2d 1017, 1022 (¶12) (Miss. Ct. App.

17

2007) (upholding a decision denying a motion for mistrial after a prosecutor referred to a defendant as a sexual predator and a child molester during closing argument in a trial for sexual battery of a minor)).

¶47. Additionally, the transcript reflects that at trial, Arnold testified that he was "just like any other dad." We have held that prosecutors "may comment upon any facts introduced into evidence, and [they] may draw whatever deductions and inferences that seem proper . . . from the facts." *Divine*, 947 So. 2d at 1022 (¶11). Here, we find that Arnold's testimony "opened the door" to the prosecutor's comments on the facts introduced into evidence—namely, Arnold's conduct toward his daughter.

¶48. The record also reflects that the trial court instructed the jury that arguments and statements from attorneys are not evidence and that the jury should ignore any argument, statement, or remark not based on the evidence. This Court has held that "opening and closing arguments of counsel are not evidence, and reversal is not required when a jury is properly instructed that statements made by counsel are not evidence." *Piccaluga v. State*, 337 So. 3d 1142, 1153 (¶51) (Miss. Ct. App. 2021) (internal quotation marks omitted).

¶49. Based on the above precedent, and after viewing the prosecutors' comments during closing arguments in the case before us in the appropriate context, we find that the comments did not rise to the level of inflaming the jury and prejudicing Arnold. As stated, prosecutors "may comment upon any facts introduced into evidence, and [they] may draw whatever deductions and inferences that seem proper . . . from the facts." *Divine*, 947 So. 2d at 1022 (¶11). After reviewing the charges against Arnold and the testimony at trial, we find that the

prosecutors' comments during closing arguments were "fair argument based upon the testimony and the evidence[.]" *Id.* at (¶12).

## 2. Send-A-Message Arguments

¶50. Arnold also claims that the State made inappropriate and prejudicial "send a message" arguments. Arnold takes issue with the following statements made by the prosecutors during closing arguments:

> We may not be able to tell [B.A.] why [Arnold] did this to her. We can only console ourselves of saying, "Yes, [B.A.], we believe you. We believe he did these despicable things to you." And for that, he deserves to be held accountable . . . .
>
> . . . .
>
> [I]t's the day to hold him accountable, ladies and gentlemen. It's time for him to stop making the calls, to stop directing how it's going to happen, to stop manipulating.

¶51. The supreme court has warned prosecutors not to "encourage juries to use their verdict to send-a-message to the public or to other potential criminals." *Miskell*, 230 So. 3d at 358 (¶46). "When reviewing a send-the-message claim, this Court considers two threshold questions, followed by a two-prong test. The threshold questions are: (1) did defense counsel object, and (2) was the comment uninvited by the defense." *Id*.

¶52. As stated, Arnold's defense counsel failed to object to any of the State's comments during closing arguments. "However, even in the absence of a contemporaneous objection, we will review on appeal a claim that a prosecutor made an improper send-a-message argument if the argument is so inflammatory that the trial judge should have objected on his own motion." *O'Connor v. State*, 120 So. 3d 390, 399 (¶23) (Miss. 2013) (internal quotation

marks omitted).

¶53.    In cases similar to the one before us, the supreme court has found no prosecutorial misconduct where a prosecutor "point[ed] at the defendant and ask[ed] the jury to hold him accountable for his actions with a guilty verdict." *Harris v. State*, 384 So. 3d 493, 498 (¶14) (Miss. 2024) (citing *McGrath*, 271 So. 3d at 443 (¶26)).  The supreme court explained that such a statement "was nothing more than simply reiterating the jury's duty set forth in the jury instructions." *Id*. (internal quotation marks omitted).

¶54.    In reviewing the State's comments in the present case, we find that the prosecutors were not asking the jury to "send a message to the public or to other potential criminals." *Miskell*, 230 So. 3d at 358 (¶46).  Rather, the prosecutors were encouraging the jury to render a verdict based on the evidence introduced at trial.  Because such statements are allowed during closing arguments, we find no prosecutorial misconduct.

### 3.    Additional Claims of Error

¶55.    Arnold further argues that the prosecutors made inappropriate comments during closing arguments that misled the jury and validated a witness's credibility.  Arnold cites no caselaw in support of his arguments that these comments were inappropriate and amounted to prosecutorial misconduct.  "Failure to cite relevant authority obviates the appellate court's obligation to review such issues." *Cork v. State*, 329 So. 3d 1183, 1190 (¶21) (Miss. 2021).  Procedural bar notwithstanding, we find no merit to Arnold's claim.  This Court has held that prosecutors are "allowed to comment on the credibility of the testimony and evidence presented at trial." *Miskell*, 230 So. 3d at 359 (¶47).

¶56. Arnold also reasserts his argument that the prosecutor made a prohibited "character argument" during closing arguments when he said, "It wasn't just [B.A.]. You heard from [N.P.]." In claiming prosecutorial misconduct, Arnold restates his argument regarding Rule 404(b) evidence. As explained above, the trial court properly admitted M.S.'s and N.P.'s testimonies regarding Arnold's alleged prior misconduct under Rule 404(b) to show motive, opportunity, lack of mistake, and plan. We therefore find no merit to Arnold's claim that the State's reference to this testimony was prosecutorial misconduct.

### B. Opening Statements

¶57. Arnold argues that during its opening statements, the State made an inflammatory and unfairly prejudicial statement about the age of Keyes, Arnold's former wife. As stated, "[t]he standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Caston v. State*, 823 So. 2d 473, 495 (¶71) (Miss. 2002). "[A] trial judge should intervene to prevent unfair argument when counsel departs entirely from the evidence, makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence." *Piccaluga*, 337 So. 3d at 1153 (¶50) (internal quotation marks omitted). In such matters, "we give deference to the trial court's rulings because the trial court is in the best position to determine if an alleged improper comment had a prejudicial effect." *Id*.

¶58. The record reflects that Arnold filed a motion in limine to restrict the State from

21

referencing the age difference between Arnold and his former wife, Keyes. Keyes was sixteen years old when she started dating thirty-three-year-old Arnold. The State argued that the fact that Arnold started dating Keyes when she was sixteen years old was relevant because it "shows his motive towards younger [sixteen]-year-olds[.]" After a hearing on the motion, the trial judge granted Arnold's motion and ruled that the State could not reference the age difference between Keyes and Arnold. However, the trial judge clarified that he was "not going to stop anybody from asking the witness what their age is[.]"

¶59. During opening statements, the prosecutor stated that Keyes and Arnold "started dating when [Keyes] was sixteen years old." Defense counsel objected, and the trial judge held a bench conference. The following exchange occurred:

[Defense Counsel]: Your Honor, my objection goes to your ruling yesterday. I think that they can ask the age, but they can't get into when they started dating, when she was 16.

THE COURT: They can say they dated. I am not going to let him go into the other stuff. That is what I ruled yesterday.

[State]: We are just talking basic ages. That is it.

THE COURT: Overruled.

¶60. Arnold argues that the State's comment about Keyes's age was inappropriate and also violated the trial court's ruling. Our review of the trial court's ruling on Arnold's motion in limine shows that although the trial court prohibited the State from referencing the age difference between Arnold and Keyes, the trial judge did not prohibit the State from stating the witness's age. After reading the entirety of the prosecutor's opening statements, we find that the State did not mention Arnold's age or reference the age difference between Arnold

22

and Keyes. The trial court overruled Arnold's objection after finding that the State did not violate its ruling on the motion in limine. As stated, "we give deference to the trial court's rulings because the trial court is in the best position to determine if an alleged improper comment had a prejudicial effect." *Id*.

¶61. After our review, we find that the State did not violate the trial court's ruling, and no prosecutorial misconduct occurred. We therefore find the trial court did not err in overruling Arnold's objection.

### C. Cumulative Error

¶62. Because we find no error on any of Arnold's claims of prosecutorial misconduct, we therefore find that "no cumulative or plain error results to warrant a reversal." *Miskell*, 230 So. 3d at 360 (¶54).

## CONCLUSION

¶63. After our review, we find no reversible error. We therefore affirm Arnold's convictions and sentences.

¶64. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. SMITH, J., NOT PARTICIPATING.**